**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TERRELL WALTON** <br><br> **v.** <br><br> **JOSEPH CORVI, ET AL.** | **CIVIL ACTION** <br><br> **NO.  25-1318** |

**MEMORANDUM**

**Baylson, J.**                                                                                          **June 16, 2026**

## I.      INTRODUCTION

This action was brought by Plaintiff, Terrell Walton ("Plaintiff"), against Defendants Joseph Corvi, Nicole Wilson, Pennsylvania Society for the Prevention of Cruelty to Animals ("PSPCA"), and Marc Schade, alleging malicious prosecution claims under both 42 U.S.C. § 1983 and Pennsylvania state law.  ECF 1-2.  Both Plaintiff and Defendants have filed cross-Motions for Summary Judgment.  For reasons stated below, although there are many disputed facts in the record, settled principles of law require the Court to grant Motions for Summary Judgment by all Defendants.  For example, one important undisputed fact is that although Plaintiff was arrested, he was never convicted of any crime because the District Attorney's Office ("DAO") *nolle prossed* the case.  Therefore, Plaintiff's Motion for Summary Judgment is **DENIED**; Defendant Corvi's Motion for Summary Judgment is **GRANTED** as to Counts I and V; Defendants Wilson's and PSPCA's Motion for Summary Judgment is **GRANTED** as to Counts II, III and VI; and Defendant Schade's Motion for Summary Judgment is **GRANTED** as to Counts IV and VII.[1]

---

[1] On April 10, 2026, Plaintiff filed a Motion for a Determination of the Sufficiency of the Answers and Objections of Defendants PSPCA and Nicole Wilson to Plaintiff's Request for Admissions (ECF 51).  Defendants PSPCA and

## II.   UNDISPUTED MATERIAL FACTS

The following is a fair account of the material factual assertions in this case, as taken from all parties' Statements of Fact ("SUMF") and briefs as well as the deposition transcripts and discovery documents reviewed by the Court.[2]   Where there are facts in dispute, the Court notes such below.  See Coulston v. City of Phila., No. CV 23-4077, 2025 WL 2377676, at *2 (E.D. Pa. Aug. 15, 2025) (**Baylson, J.**).

### A.  The August 4, 2021, Incident

Plaintiff Terrell Walton was employed as an Animal Control Officer by the Philadelphia Animal Care and Control Team ("ACCT"), an animal care shelter.  Plaintiff was trained to check the temperament of dogs and how to use a catch pole,[3] as well as other equipment.  Plaintiff testified that he used the catch pole over 200 times while employed at ACCT, and that he was never unsuccessful in using a catch pole and never had an issue getting the lead of a catch pole around a dog's neck.  Plaintiff was eventually terminated from ACCT in June 2022.

On August 4, 2021, after a traffic stop, Brian Landis was arrested by the Philadelphia Police Department's ("PPD") Narcotics Strike Force for allegedly possessing illegal narcotics.  At the time of his arrest, Landis has his dog Saint, an adult male Pitbull, in his car.  Landis co-owned Saint with Tiffany Lavelle.  Due to Landis' arrest, the Narcotics Strike Force instructed Landis to

---

Wilson responded to this Motion on April 24, 2026.  ECF 58.  This Court will **DENY** this Motion, as the Court finds that the answers and objections were sufficient.

[2] See ECF 50-3 (Plaintiff's SUMF); ECF 52 (PSPCA's and Wilson's SUMF); ECF 53 (Schade's SUMF); ECF 54-4 (Corvi's SUMF); ECF 55-1 (Corvi's Response to Plaintiff's SUMF); ECF 57 (PSPCA's and Wilson's Response to Plaintiff's SUMF); ECF 59-3 (Plaintiff's Response to Schade's SUMF); ECF 60-3 (Plaintiff's Response to Corvi's SUMF); ECF 62 (Schade's Letter Response); ECF 64 (Plaintiff's Response to PSPCA's and Wilson's SUMF).

[3] A catch pole or control stick is to be used when the movement of a dog is unable to be safely accomplished with a leash and is necessary due to a medical or safety concerns relative to the dog's current location.  See ECF 52-7, Exhibit F (Animal Handling Techniques (Catch Pole) Policy), at 4.

load Saint into the rear of a police car.  Landis loaded Saint into one of the police cars without incident.  Thereafter, PPD Officer Joseph Corvi took Saint into his custody and transported Saint to ACCT for safekeeping.  Saint was not injured during transport to ACCT.

Upon arrival at ACCT, Plaintiff was tasked with removing Saint from Officer Corvi's police car and taking him into ACCT.  This interaction was captured on surveillance video.  See ECF 50, Exhibits 17–19; ECF 52-12, Exhibit K; ECF 54, Exhibit 4; ECF 55, Exhibit 4.  Plaintiff initially approached the police car with a nylon leash.  Plaintiff asked Officer Corvi about Saint's temperament, and Officer Corvi responded that Landis, Saint's owner, had put Saint in the backseat.  Plaintiff approached the rear door of the police car and opened it, where Saint was sitting on the back seat.[4]  Plaintiff then closed the door, left the area, and came back with a catch pole.

Plaintiff used the catch pole to remove Saint from the police car.  While using the catch pole, Plaintiff at times used one hand on the catch pole while using the other hand to hold open the car door.  Other times, Plaintiff used both hands on the catch pole.  At one point, Plaintiff removed the catch pole from the car to adjust the positioning.  Plaintiff's intent was to get the lead (noose) around Saint's neck and get Saint into the building, while making sure everyone was safe.

Unfortunately, during Plaintiff's use of the catch pole, Saint sustained an injury.[5]  Specifically, when Saint exited Officer Corvi's vehicle, he was bleeding.  Officer Corvi also observed that Saint's jaw was bloody and appeared to be misaligned.

---

[4] Plaintiff asserts that Saint displayed dangerous, threatening, and aggressive tendencies towards Plaintiff when he approached the vehicle, including "growl[ing]" and "show[ing] teeth." ECF 50-3, ¶ 6. Defendant Corvi disputes this, asserting there is no aggression seen from Saint on video as the patrol car has tinted windows and the surveillance video does not have audio. ECF 55-1, ¶ 6. Defendants PSPCA and Wilson also deny this fact. ECF 57, ¶ 6.

[5] Plaintiff asserts that Saint bit the handle of the catch pole. ECF 50-3, ¶ 9. Defendant Corvi disputes this, stating this is a "speculation that remains unverified." ECF 55-1, ¶ 9. In response to Plaintiff's SUMF, Defendants PSPCA and Wilson deny this fact. ECF 57, ¶ 9. However, in Defendants PSPCA's and Wilson's SUMF, they assert that "Saint

3

Using the catch pole, Plaintiff caused Saint to exit the vehicle and walk into the ACCT building. Plaintiff brought Saint into the emergency triage room, where Dr. Roxanne Borrok, a veterinarian and acting medical director at ACCT, examined Saint. Saint was also bleeding from his mouth when he was in the emergency triage room. Dr. Borrok sedated Saint and diagnosed him with a distal mandibular fracture,[6] after observing that Saint's jawbone was being held on by the soft tissue of his mouth. Dr. Borrok prepared a Medical History report containing her observations of Saint, diagnosis, and medical plan. Dr. Borrok noted Saint was "[b]leeding from mouth after having bit the control stick." ECF 52-9, Exhibit H (Medical History of Saint). Based on Saint's injuries and poor prognosis, the decision was made to proceed with humane euthanasia.

After Plaintiff removed Saint from the police car, Officer Corvi left ACCT Philly without making any arrest and noted Saint's injury in an Incident Report (Form 75-48). ECF 54-4, ¶ 12;

---

bit down on the pole," but Plaintiff "does not recall whether Saint bit down on the pole before the noose was around his neck." ECF 52, ¶ 26.

Plaintiff also testified that he did not know if he heard Saint "yip" or "yell" while Plaintiff was attempting to use the catch pole. ECF 52, ¶ 34; ECF 64, ¶ 34; see also ECF 52-6, Exhibit E (Plaintiff's Deposition), at 78:9–79:5. However, Plaintiff has previously observed situations where a dog has bitten a catch pole, and in at least one prior instance, the dog was bleeding and had broken teeth due to biting the catch pole. ECF 52, ¶ 33; ECF 64, ¶ 33.

[6] Plaintiff asserts Saint's distal mandible fracture is consistent with and was caused by the force of Saint's biting of the catch pole. ECF 50-3, ¶ 14. Defendant Corvi disputes this and refers to Defendant Wilson's testimony that she confirmed with Dr. Borrok that "there were no medical reasons that would medically compromise the jaw of the dog" and confirmed with Dr. Lisa Gramanis (misspelled as Germanis), PSCPA Medical Director and Forensic Veterinarian, that "without a medical compromised condition, she had never heard" of a dog breaking its jaw by biting down on a metal object. ECF 55-1, ¶ 14; ECF 52-8, Exhibit G (Wilson's Deposition), at 205:14–213:20. Defendants PSPCA and Wilson also dispute this, as Defendant Wilson concluded that Plaintiff's mishandling of the catch pole caused Saint's injury. ECF 57, ¶ 14; ECF 52, ¶ 128. Specifically, Defendant Wilson asserts Plaintiff's actions were reckless because Plaintiff moved the catch pole while Saint was biting on it, which created leverage that broke Saint's jaw. ECF 52, ¶ 128; ECF 52-8 at 204:3-18, 213:5-20, 218:1–221:23, 228:6-18. Defendant Wilson also criticized Plaintiff's failure to use a slow methodical process to give Saint time to get accustomed to the catch pole, or to seek assistance so that someone else could control the door while Plaintiff focused on controlling the catch pole. ECF 52, ¶ 129. Defendant Wilson based her conclusions on the following information: Dr. Borrok advised that there were no medical reasons that would compromise Saint's jaw; Saint's owner confirmed that Saint has no prior medical history indicating a compromised jaw; and Dr. Gramanis advised that absent a pre-existing medical condition, she had never known a dog to break its jaw by biting down on a metal object. ECF 52-8 at 206:6–212:6; see also ECF 54-4, ¶ 29.

4

ECF 54, Exhibit 5.  Officer Corvi testified at his deposition that he notified his sergeant of how Plaintiff handled Saint, and his sergeant commented "it's up to them to handle it" (meaning ACCT).  ECF 52-5, Exhibit D (Corvi's Deposition), at 47:8-13.  Prior to August 4, 2021, Officer Corvi never met Plaintiff.

### B.  PPD Investigation and "Justice for Saint" Campaign

Following the incident, ACCT informed Landis that Saint suffered an injury during transport to ACCT.  Landis then lodged a civilian complaint with the PPD's Internal Affairs Division ("IAD") against Officer Corvi, accusing him of abusing Saint.  As a result of the civilian complaint, the PPD IAD investigated Officer Corvi.  On September 8, 2021, Officer Corvi provided a statement to Sergeant Richard Stein concerning his observations of the August 4, 2021, encounter with the Pitbull and use of the catch pole.  Ultimately, the PPD IAD found Landis' complaint that Officer Corvi injured the dog to be "Unfounded."  ECF 52, ¶ 124; ECF 64, ¶ 124.

Meanwhile, Saint's owners, Brian Landis and Tiffany Lavelle, launched a "Justice for Saint" campaign on various news outlets and media platforms, including social media.  The "Justice for Saint" campaign included a petition to gather signatures to raise awareness, mobilize supporters, and influence decision-makers to terminate the employment of ACCT leadership.  The campaign generated over 7,000 signatures.

### C.  PSPCA Investigation

At the time of the August 4, 2021, Incident, Nicole Wilson was employed by PSPCA as the Director of Animal Law Enforcement and Shelter Services, and Ian Oakley, Esq., was employed by PSPCA as General Counsel.  As Director of Shelter Services, Wilson was responsible for all animal care team members, including assisting with the training of the use of a catch pole and creating policies around the use of catch poles.  Wilson testified at her deposition that she is

an expert in the use of a catch pole and has provided training on the proper use of a catch pole to police and state dog wardens.  Wilson also testified that she created policies on the proper use of a catch pole for the PSPCA.  Wilson testified that she has used a catch pole hundreds of times and states that it is recommended to have two hands on the catch pole while operating it.  ECF 52-8, Exhibit G (Wilson's Deposition), at 30:17-18, 215:20-22.

Wilson was also appointed as a Humane Society Police Officer.  As a Humane Officer, she investigates cases of cruelty and neglect of animals and determines if prosecution is appropriate.  Wilson's training included instruction regarding negligence and cruelty to animals.  Wilson's training also covered how to identify criminal behavior and criminal procedure, such as what information to include in an affidavit of probable cause and in a warrant for arrest, how to interview people, and how to document her investigations.  She is responsible for supervising humane society police officers, ensuring that cases are being investigated, and that officers are following the procedures for investigating and processing a case.  Wilson testified that she has approximately 20 years of experience reviewing animal cruelty cases and has conducted tens of thousands of animal cruelty investigations in Pennsylvania.  Wilson further testified that if a witness' statement was inaccurate or inconsistent with other evidence that the Humane Officer personally discovered, the affidavit should include both statements.

Between August 4, 2021, and August 9, 2021, PSCPA received complaints on their animal cruelty hotline, including from members of the public, regarding Saint being euthanized.  Wilson also received a phone call from Assistant District Attorney ("ADA") Barbara Paul regarding this case, as ADA Paul handled many animal cruelty and neglect cases at ACCT.[7]  Saint's owner, Brian

---

[7] Wilson also testified that by September or October 2021, she had discussions with ADA Paul regarding initiating criminal proceedings against Plaintiff.  ECF 52-8 at 325:23–326:10.

Landis, also filed a complaint with PSPCA, requesting an investigation into animal cruelty concerning Saint. PSPCA never received a complaint from Officer Corvi or the PPD requesting that an investigation be initiated concerning Saint's death.

On August 9, 2021, Wilson began investigating the August 4, 2021, Incident and Plaintiff's interactions with Saint.[8] As part of her investigation, Wilson informed Aurora Valezquez, ACCT's Executive Director, that PSPCA received a complaint and asked for any video regarding the incident. Wilson reviewed video of Plaintiff's interactions with Saint outside ACCT and Plaintiff's use of the catch pole, reviewed video of Saint from inside ACCT, and reviewed photographs of Saint's injuries. Wilson also confirmed that Plaintiff was properly trained to use a catch pole. Prior to August 4, 2021, Wilson met Plaintiff a few times, mostly during training, and Plaintiff testified there was no animosity between them.

As part of her investigation, Wilson conducted multiple interviews, including with Dr. Borrok and Dr. Gramanis. Dr. Borrok stated in her interview with Wilson that she had conducted a medical exam and determined that Saint suffered a mandibular fracture because of trauma. ECF 52-8, at 206:6–207:24, 218:23–220:13; see also ECF 52-13, Exhibit L (Wilson Affidavit). Dr. Borrok indicated that there appeared to be no bony abnormalities or underlying condition in Saint which would cause the bone to be compromised or unusually susceptible to fracture. ECF 52-8, at 206:6–207:24, 218:23–220:13; ECF 52-13. Dr. Gramanis stated in her interview with Wilson that without a medically compromised condition, she had never heard of a dog breaking its jaw by

---

[8] Plaintiff disputes the "impetus" of Wilson's investigation, asserting that Wilson was "pressured" by ADA Paul to undertake an animal abuse investigation and that Wilson was "concerned that the nature of the case would result negative publicity and present a public relations challenge if criminal charges were not lodged." ECF 54-4, ¶ 22; ECF 60-3, ¶ 22. Plaintiff further asserts that this is why Wilson chose to assign herself, rather than a line officer under her command, to undertake this investigation. ECF 60-3, ¶ 22. The Court finds that this dispute is not material.

biting down on a metal object.[9]   ECF 52-8, at 206:19–212:6.   Wilson also reviewed records regarding Saint's treatment and concluded that there was no medical neglect to Saint.

On December 30, 2021, Wilson interviewed Officer Corvi, as he was a witness to the incident.   The purpose of the interview was to confirm that Saint had not been injured during transport to ACCT.   Officer Corvi initially did not respond to requests for an interview but eventually appeared after receiving instructions from his sergeant.   Officer Corvi testified that his memory was not 100% accurate at the time of the interview, he did not rely on notes for the interview, and when he appeared for the interview, he thought Wilson was an ACCT investigator.

During the interview, Officer Corvi stated[10] he could not see fully inside the vehicle as the windows were open approximately 8 inches for ventilation and the windows were tinted.   Officer Corvi further noted that he was not that "close to the dog" and didn't hear the growling.   Officer Corvi reported that he observed Plaintiff making jabbing motions at Saint, that something was entangled with the pole, and the catch pole was almost entirely extended into the vehicle.   Officer Corvi also stated that Plaintiff never asked for assistance, Plaintiff was moving his hands up and down the length of the catch pole, and Plaintiff never took a break or pulled the catch pole out of the car to give the dog a break.   Officer Corvi then saw Plaintiff lift the dog up in the air at least two feet off the ground with the catch pole, which is when he saw a trail of blood on the ground.[11]

---

[9] Wilson stated that this was the basis for determining that Plaintiff recklessly ill-treated Saint.   ECF 52, ¶ 81; ECF 52-8 at 205:14–213:20.

[10] Plaintiff disputes all these facts and states that they are contradicted by surveillance footage.   ECF 64, ¶¶ 111–18.   The Court finds that this factual dispute is not material.

[11] Officer Corvi later testified that when he told Wilson that Saint was lifted two feet off the ground, he should have specified that he meant "the dog was lifted off the floor of the vehicle onto the bench seat and then was brought outside and the dog was put down on all fours outside the car."   ECF 52-5, at 41:15-19.   Wilson testified that based on her review of the ACCT video, she observed Plaintiff "leverage the dog up and at least picks up at least the front feet off the floor of the car to remove the dog from the car" but she never testified that she observed Plaintiff lift Saint two feet off the ground.   ECF 52, ¶¶ 122, 141; ECF 64, ¶¶ 122, 141; see also ECF 52-8 at 291:19-24.   Wilson further

Officer Corvi stated that he was disturbed by the dog's condition and how the dog was handled so he attempted to enter the building and report what he had seen, but he was stopped and told that only employees were permitted inside. Officer Corvi also testified that he was shown the surveillance video after the interview and that he did not receive anything in writing from Wilson to review and sign.

Furthermore, Wilson interviewed other individuals at ACCT, including Allison Karl (Community Support Manager), April Moore (Veterinary Nurse Assistant), and Kate Kelly (Medical Manager). These individuals confirmed that Saint was bleeding and had a fractured jaw, and that Plaintiff stated that Saint was "aggressive" towards him and that he needed to use a catch pole to remove Saint from the vehicle. Landis also provided a Victim/Witness Statement to Wilson. On January 24, 2022, Wilson contacted Plaintiff to give a statement, but he declined to do so, citing the advice of an attorney.

After concluding her investigation, Wilson prepared an Animal Cruelty Affidavit with her findings.[12] Wilson documented what she personally observed on the surveillance video, including:

> Affiant observed Mr. Walton sticking the control stick inside the police vehicle and violently moving the stick in what appears to be an effort to secure the dog in the back seat. Affiant was unable to see through the windows of the police car. Affiant observed Mr. Walton moving the pole up and down with one hand and holding the door with the other, and then proceeding to use two hands to shift and twist the pole in an attempt to catch the dog. These actions are inconsistent with proper use of the catch pole. After struggling for several minutes, Affiant observed Mr. Walton

---

asserted that Officer Corvi's statement that he saw Saint lifted two feet off the ground did not influence her decision on probable cause. ECF 52, ¶ 123; ECF 64, ¶ 123; see also ECF 52-8 at 292:4-8.

[12] Plaintiff disputes that Wilson's investigation was "fair" (see ECF 75–76) and asserts that the Animal Cruelty Affidavit omits material exculpatory facts and includes inaccurate facts and embellished opinions, which falsely portray Plaintiff's actions. ECF 59-3, ¶ 40; ECF 60-3, ¶ 47. Wilson testified that there was no information that she purposefully omitted from her Affidavit, and the findings were truthful and accurate to the best of her knowledge and formed only after a reasonable investigation was undertaken. ECF 52, ¶ 146; ECF 52-8 at 333:20-24.

forcefully remove the dog from the vehicle and observed blood dripping from the mouth of the dog.[13]

ECF 52-13.  Wilson also included her interview with Dr. Borrok and Officer Corvi's statements. Wilson testified that "she did not see all of the things that Officer Corvi said he saw" and that she did not feel it was necessary to explicitly document that Officer Corvi's account was inconsistent with the surveillance footage or discuss this with Oakley.  Instead, she testified that she included her own account of the video.  Based upon her investigation, Wilson believed there was probable cause that Plaintiff violated cruelty to animals, 18 Pa.C.S.A. § 5533, a misdemeanor, and recommended criminal charges be filed against Plaintiff.

Wilson submitted her Animal Cruelty Affidavit to Oakley for review, and Oakley made edits to the report, including adding the term "violently" to the statement: "Affiant observed Mr. Walton sticking the control stick inside the police vehicle and violently moving the stick in what appears to be an effort to secure the dog in the back seat."  ECF 52-8 at 200:17–203:8.  Oakley testified that his impression of the video was that Plaintiff was violently moving the catch pole.

### D. Plaintiff's Criminal Prosecution

On April 18, 2022, Oakley emailed Sergeant Megan Lynch regarding an investigation of animal cruelty towards a Pitbull named Saint.[14]  The next day, Sergeant Lynch assigned this case

---

[13] Plaintiff also disputes that Wilson's account of the surveillance video was accurate and asserts the Animal Cruelty Affidavit does not include any statement about what the video "actually depicts."  ECF 64, ¶¶ 142, 146.

[14] In Philadelphia, established procedure for animal cruelty cases provides that Humane Society Police Officers investigate cases and submit their findings and discovery materials to county detectives, who then review the findings and provide recommendations for charges to the DAO Charging Unit.  The DAO Charging Unit reviews affidavits, warrants, and other evidence presented to them by law enforcement for probable cause to bring criminal charges, including for people already in custody or warrants for arrest.  The district attorney ("DA") assigned to the case can then approve the charges, deny the charges, or modify which charges are approved.  In other words, in Philadelphia, Humane Society Police Officers, including Wilson, can only investigate and recommend charges, but the discretion to charge criminal offenses rests solely with the DAO.  Humane Society Police Officers do not have access to the Preliminary Arraignment Reporting System ("PARS") and thus cannot generate affidavits of probable cause, but in other Pennsylvania counties, Humane Society Police Officers prepare affidavits of probable cause and submit them

to Detective Schade. Detective Schade received discovery from Wilson's investigation, including statements from witness interviews, photos of Saint's injury, and exterior video footage of ACCT. Detective Schade testified that he did not conduct an independent investigation into the August 4, 2021, Incident, he never reviewed the discovery he received, and he never re-interviewed any witnesses, including Officer Corvi. Rather, Detective Schade copied the facts and information from Wilson's Animal Cruelty Affidavit into a PARS Affidavit of Probable Cause and submitted it to his supervisor, Sergeant Lynch, for approval. Once approved, the Affidavit of Probable Cause was sent, along with the discovery, to the DAO Charging Unit.

Since 2007, Detective Schade has been employed as a Philadelphia County detective and assigned to the Philadelphia. Detective Schade is trained in preparing affidavits of probable cause and has personally prepared about 100 such affidavits. Prior to this case, Detective Schade had been involved in at least five prosecutions of animal cruelty, in which he relied upon PSPCA's investigations, and the evidence provided, and used that information to prepare affidavits of probable cause. Detective Schade testified that he could not recall whether he deleted anything from Wilson's Animal Cruelty Affidavit before copying it into the Affidavit of Probable Cause.

In 2022, ADA Matthew Delbridge was assigned to the DAO's Charging Unit. ADA Delbridge reviewed the Affidavit of Probable Cause prepared by Detective Schade and the discovery, including witness interviews and photographs of Saint. ADA Delbridge testified that he could not recall if he reviewed any surveillance footage, but if the footage was provided to him, he would have reviewed it. ECF 52-22, Exhibit U (Delbridge's Deposition), at 9:14-18.

---

directly to issuing authorities. Here, in accordance with established procedure, Wilson provided copies of all investigation materials she had to Oakley, who provided it to the DAO. This included Wilson's Animal Cruelty Affidavit, witness statements, the interview with Corvi, records and photographs from ACCT, surveillance footage, and photographs of Saint.

Based upon his review of the Affidavit of Probable Cause and the discovery, ADA Delbridge found there was probable cause to bring felony and misdemeanor charges against Plaintiff.[15]  ADA Delbridge testified that he could not state for certain whether the charges filed against Plaintiff were the exact charges that Detective Schade recommended or whether ADA Delbridge changed them.  ECF 52-22, at 26:11-18.  However, he testified that any decision to "upgrade charges from a misdemeanor to felony" was purely in the hands of the DAO.  Id. at 43:22–44:19.  On May 4, 2022, ADA Delbridge approved criminal charges and prepared a criminal complaint against Plaintiff.

On May 10, 2022, Detective Schade swore out an Affidavit of Probable Cause recommending criminal charges against Plaintiff for aggravated cruelty to an animal, a third-degree felony (18 Pa.C.S.A. § 5534), and cruelty to an animal, a second-degree misdemeanor (18 Pa.C.S.A. § 5533).  Detective Schade appeared before issuing authority Naomi Williams and swore that "the facts set forth in the affidavit are true and correct to the best of my knowledge, information and belief and that probable cause to arrest exists."  That same day, Naomi Williams initiated criminal process and issued an arrest warrant for Plaintiff.

On July 28, 2022, Plaintiff surrendered himself to authorities and was taken into custody. On July 29, 2022, Plaintiff was preliminarily arraigned, and bail was set at $25,000.00.  Plaintiff was confined in the Philadelphia prison system from July 28, 2022, through August 8, 2022.

Wilson testified that she was not aware that the DAO added a felony charge until after the arrest warrant came back, and that she spoke with ADA Clarke Beljean, the assigned prosecutor

---

[15] Plaintiff asserts that "the evidence demonstrates any probable cause finding Matthew Delbridge may have made was undertaken without review of the video surveillance evidence, falsehoods and omissions which falsely impute animal abuse behavior to the plaintiff."  ECF 64, ¶ 162.  The Court finds that this factual dispute is not material, and as a matter of law, there was probable cause to arrest and charge Plaintiff.  However, Plaintiff was never convicted of any crime because the DAO nolle prossed the case.

for Plaintiff's criminal case, and reiterated that she thought it was appropriate to charge Plaintiff with only a misdemeanor and not a felony. ADA Beljean also testified that he spoke with Wilson several times throughout the course of the investigation, both in person and over the phone.

On October 17, 2022, a Preliminary Hearing was conducted before Judge Wendy L. Pew. ADA Beljean testified that he believed evidence supported a *prima facie* case that Plaintiff violated 18 Pa.C.S.A. § 5533 and 18 Pa.C.S.A. § 5534. In preparation for the Preliminary Hearing, ADA Beljean reviewed the surveillance video between 10 and 20 times. ADA Beljean relied on the Affidavit of Probable Cause and surveillance footage from both inside and outside of ACCT. ADA Beljean identified the following facts as supporting criminal charges: the dog was uninjured when placed in the police vehicle; the dog sustained no injuries during transport; the only person who interacted with the dog was Plaintiff, who used a catch pole to remove the dog from the rear of the police vehicle; Plaintiff struggled to get the catch pole around the dog's neck; the dog's jaw was broken on both sides; and the dog had to be euthanized.[16] Following the Preliminary Hearing, Judge Pew determined that the Commonwealth had met its burden of establishing a *prima facie* case and held Plaintiff for court on both the felony and misdemeanor charges.

ADA Beljean testified that Plaintiff's criminal defense attorney, Keir Bradford Grey, Esq., met with DA Krasner to request that he consider something other than a continued prosecution. After this meeting, DA Krasner decided to hold off-the-record proffer sessions with Plaintiff, where Plaintiff came in and explained what happened in the video. DA Krasner also reviewed the file, including the surveillance footage and Affidavit of Probable Cause. DA Krasner then decided

---

[16] ADA Beljean also testified that, in his opinion, some of the evidentiary weaknesses in this case were that the surveillance footage lacks audio and Officer Corvi's limited vantage point as to what occurred in the police car. ECF 52-25, Exhibit X (Beljean's Deposition), at 28:20–30:15.

to discontinue the prosecution of Plaintiff based on prosecutorial discretion and directed ADA Beljean to *nolle prosequi* the pending criminal charges.

On March 31, 2023, the DAO (represented by ADA Beljean) moved the trial court to *nolle prosequi* without prejudice the criminal charges against Plaintiff based on prosecutorial discretion. Wilson testified that she was not privy to the rationale or reasoning behind DA Krasner's decision to *nolle prosequi* Plaintiff's criminal case.

## III.    PROCEDURAL HISTORY

On December 2, 2024, Plaintiff commenced this action in the Philadelphia Court of Common Pleas, asserting state law malicious prosecution claims.  ECF 1-1.  On February 11, 2025, Plaintiff filed an Amended Complaint in the Court of Common Pleas, asserting the following claims:

1.  Count I - Common law state claim for malicious prosecution, against Defendant Corvi

2.  Count II - Common law state claim for malicious prosecution, against Defendant Wilson

3.  Count III - Common law state claim for malicious prosecution – vicarious liability, against Defendant PSPCA

4.  Count IV - Common law state claim for malicious prosecution, against Defendant Schade

5.  Count V - 42 U.S.C. § 1983 malicious prosecution in violation of the Fourth Amendment, against Defendant Corvi

6.  Count VI - 42 U.S.C. § 1983 malicious prosecution in violation of the Fourth Amendment, against Defendant Wilson

7.  Count VII - 42 U.S.C. § 1983 malicious prosecution in violation of the Fourth Amendment, against Defendant Schade

ECF 1-2.

On March 12, 2025, Defendant Corvi removed the case to this Court pursuant to 28 U.S.C. § 1441, with the consent of all other Defendants.  ECF 1 at ¶ 9.  Defendants Corvi (on March 19, 2025), Wilson (on March 21, 2025), and the PSPCA (on March 25, 2025) each answered the Amended Complaint.  See ECF 6–8.  On March 18, 2025, Defendant Schade filed a Motion to Dismiss.  ECF 4.  Plaintiff responded to the Motion on April 1, 2025.  ECF 11.   Defendant Schade's Motion to Dismiss was denied on April 30, 2025.  See ECF 13–14.  Defendant Schade answered the Amended Complaint on May 8, 2025.  ECF 15.

Following discovery, all Parties moved for summary judgment:

1.  Plaintiff's Motion for Summary Judgment (ECF 50)

2.  Defendants PSPCA's and Wilson's Motion for Summary Judgment (ECF 52)

3.  Defendant Schade's Motion for Summary Judgment (ECF 53)

4.  Defendant Corvi's Motion for Summary Judgment (ECF 54).

The Court heard oral argument on May 20, 2026.  See ECF 75–76.  The Court also reviewed the surveillance footage following oral argument.

## IV.    LEGAL STANDARD – SUMMARY JUDGMENT

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## V.      LEGAL STANDARD – MALICIOUS PROSECUTION

To establish a malicious prosecution claim under § 1983, a plaintiff must show, "(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendants initiated the proceeding without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) he suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Geness v. Cox, 902 F.3d 344, 355 (3d Cir. 2018). The elements of a malicious prosecution claim under Pennsylvania state law are identical to those under § 1983, except for a deprivation of liberty. See Tomaskevitch v. Specialty Recs. Corp., 717 A.2d 30, 33 (Pa. Commw. Ct. 1998).

Generally, prosecutors, not police officers, are responsible for initiating criminal proceedings. Henderson v. City of Phila., 853 F. Supp. 2d 514, 518–19 (E.D. Pa. 2012) (Brody, J.). However, an officer may be considered to have initiated a criminal proceeding if "he or she

knowingly provided false information to the prosecutor or otherwise interfered with the prosecutor's informed discretion." Id. (citations omitted).

Probable cause exists "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." Goodwin v. Conway, 836 F.3d 321, 327 (3d Cir. 2016). At the summary judgment stage, the existence of probable cause is assessed based on the totality of the circumstances available to the officer at the moment of arrest. Ockley v. Radnor Twp., 802 F. Supp. 3d 743, 760 (E.D. Pa. 2025) (Weilheimer, J.) (citing Harvard v. Cesnalis, 973 F.3d 190, 200 (3d Cir. 2020)). However, probable cause does *not* require factual correctness. Id. (citing Illinois v. Rodriguez, 497 U.S. 177, 184 (1990)).

Malice is defined as "ill will in the sense of spite, lack of belief by the actor himself in the propriety of the prosecution, or its use for an extraneous improper purpose." Lee v. Mihalich, 847 F.2d 66, 70 (3d Cir. 1988), abrogated on other grounds, Albright v. Oliver, 510 U.S. 266 (1994). Malice may be inferred from the absence of probable cause. Id. at 70 n.8.

## VI.    PARTIES' CONTENTIONS[17]

### A. Plaintiff's Contentions (ECF 50)[18]

First, Plaintiff argues that all Defendants lacked probable cause because a reconstructed Complaint and Affidavit would have 12 false facts, exaggerations, and inaccuracies removed from

---

[17] The Parties' contentions are generally the same in their own Motions for Summary Judgment and their oppositions to the opposing party's Motion for Summary Judgment. See ECF 50 (Plaintiff's Motion); ECF 52 (PSPCA's and Wilson's Motion); ECF 53 (Schade's Motion); ECF 54 (Corvi's Motion); ECF 55 (Corvi's Response to Plaintiff's Motion); ECF 56 (PSPCA's and Wilson's Response to Plaintiff's Motion); ECF 59 (Plaintiff's Response to Schade's Motion); ECF 60 (Plaintiff's Response to Corvi's Motion); ECF 61 (Plaintiff's Response to PSPCA's and Wilson's Motion); ECF 62 (Schade Letter Brief); ECF 69 (Corvi's Reply in Support). Therefore, this Court will address them together. Unless otherwise noted, all citations are to the Parties' own Motions.

[18] Plaintiff contends, and Defendants concede (or do not explicitly contest) that (1) the proceedings terminated in his favor because on March 31, 2023, the DAO moved the trial court to *nolle prosequi* the criminal charges lodged against

17

the documents. See ECF 50-2 at 39–40 (describing the false facts). Plaintiff further contends that information was recklessly omitted from the Affidavit and including that information would establish that there was no probable cause to charge Plaintiff. See id. at 40–43 (describing the omitted information). Plaintiff contends this includes Dr. Borrok's expert report; the findings of Plaintiff's canine expert, Dr. Brandau; Corvi's statement to the IAD; and the ACCT's internal investigation findings. See id.

### 1.    Defendant Joseph Corvi

As to Defendant Corvi, Plaintiff argues he initiated proceedings because Defendant Corvi was a witness to the encounter with the Pitbull and use of the catch pole, and was interviewed by Wilson and Ian Oakley, Esq. ("Oakley") about this incident. Id. at 14–15. Plaintiff contends that Defendant Corvi accused Plaintiff of behavior consistent with animal abuse and thus, Wilson and Oakley inserted this statement into an Animal Cruelty Affidavit/Report. Id. Plaintiff argues that a police officer can be liable if the officer influenced or participated in the decision to institute criminal proceedings. Id. at 37. Plaintiff argues that no reasonable person could conclude that Corvi did not influence or participate in the decision to institute criminal process against him. Id.

Next, Plaintiff argues Defendant Corvi deliberately provided false and embellished facts or omissions to Wilson and Oakley which he knew to be false or had serious doubts as to their truth, when describing Plaintiff's encounter with Saint and use of the catch pole. Id. at 44–45. Plaintiff contends Defendant Corvi was an experienced officer who had knowledge that, upon

---

him, such charges were dismissed, and he was discharged without jurisdictional restraint, ECF 50-2 at 37–38; and (2) Plaintiff suffered a deprivation of liberty, as he was incarcerated for 11 days, had bail imposed upon him ($25,000), had his liberty to travel outside of the Commonwealth restricted, and was compelled to attend court proceedings, id. at 47–48. See also ECF 52 at 6, 10; ECF 53 at 5; ECF 54-1 at 5, 5 n.1.

considering his false reporting of Plaintiff's encounter with Saint, an issuing authority would decide that probable cause existed and was sufficient to initiate criminal process.  Id.

### 2.    Defendant Nicole Wilson

As to Defendant Wilson, Plaintiff argues Wilson and Oakley were employed by PSPCA. Id. at 11.  Wilson served as the Director of Animal Law Enforcement and Shelter Services and Oakley was general counsel.  Id.  Acting within the scope of their employment, Wilson and Oakley undertook an investigation of civilian complaints that a Pitbull named "Saint" had been euthanized after suffering abuse at an animal shelter.  Id. at 12.  As a result of the complaint and the "Justice for Saint crusade" lodged by the owners of the Pitbull against Officer Corvi accusing him of abusing the Pitbull, Corvi became the subject of investigation undertaken by the PPD Internal Affairs Division.  Id.  Plaintiff contends that Wilson chose to assign herself, rather than a line officer under her command, to undertake an investigation of the complaints, as she was concerned that the nature of the case would result in negative publicity and present a public relations challenge if criminal charges were not lodged.  Id. at 13.  Plaintiff argues the investigation included conducting interviews of material witnesses, reviewing surveillance video(s), documenting the investigation in an Affidavit, referring the findings of the investigation to the DAO for prosecution, sharing evidence gathered during the investigation with the DAO, and recommending criminal charges be filed against Plaintiff.  Id. at 13–14.

Plaintiff argues that Wilson was an experienced law enforcement officer but chose to include falsehoods and omissions in her Affidavit to manufacture the appearance of the existence of probable cause that Plaintiff engaged in animal abuse.  Id. at 45–46.  Plaintiff argues Wilson knew when preparing an Animal Cruelty Affidavit as a Humane Society Police Officer, in the event her investigation demonstrated a statement of a witness to be inconsistent with video

evidence, she had a professional obligation to document in the Affidavit that the statement of a witness was inconsistent with the video evidence. Id. at 32–33. Plaintiff further argues Wilson knew she had a professional obligation to bring to the attention of the DAO her belief, if so, that a witness' account of material events is inconsistent with video or photo evidence. Id.

Lastly, Plaintiff contends the Affidavit regarding the encounter with the Pitbull and use of the catch pole cannot be reconciled with the video evidence. Id. at 33. Plaintiff argues Wilson was predisposed to bring criminal charges to avoid negative publicity and public relations challenges that she anticipated would arise in the event criminal charges were not lodged. Id.

### 3. Defendant PSPCA

Overall, Plaintiff argues that Defendant PSPCA is liable based on vicarious liability. Id. at 9. Plaintiff does not make a specific argument that the PSPCA initiated proceedings against him, and only alleges that Wilson, who was an employee of the PSPCA, did. Id. at 11–12. Moreover, Plaintiff does not make a specific argument that the PSPCA lacked probable cause and acted maliciously, and alleges only that Wilson, who was an employee of the PSPCA, lacked probable cause and acted maliciously. Id. at 45–46.

### 4. Defendant Marc Schade

As to Defendant Schade, Plaintiff argues Schade is an experienced law enforcement officer as he has been in law enforcement since 1996. Id. at 33. Accordingly, Plaintiff contends that Schade knew an Affiant should never include facts in an Affidavit that the affiant knows to be false or those an affiant has a high degree of awareness that may be false. Id. at 33–34. Plaintiff further argues Schade knew an Affiant should never omit facts that the Affiant reasonably believes the issuing authority will want to see in the Affidavit of Probable Cause to decide if probable cause exists that a crime was committed. Id.

20

Plaintiff argues that, on May 10, 2022, Schade swore to the truth of the material facts inserted into a Criminal Complaint and Affidavit of Probable Cause charging him with animal cruelty and abuse charges before an issuing authority. Id. at 34. Plaintiff argues the material facts in the Complaint and Affidavit cannot be reconciled with the undisputable video evidence. Id.

Plaintiff contends Schade deliberately inserted false and embellished facts into a Criminal Complaint and Affidavit of Probable Cause and swore them to be true before an issuing authority which he knew to be false, or had serious doubts as to their truth, when describing the encounter with the Pitbull and use of the catch pole. Id. at 46. Plaintiff further argues Schade deliberately omitted to include exculpatory facts known to him in the Criminal Complaint and Affidavit of Probable Cause which he knew an issuing authority would wish to know and rely upon when deciding whether probable cause exists. Id. Plaintiff argues that Schade's deliberate behavior is malicious, outrageous, and willful misconduct. Id. at 46–47.

### 5.  Qualified Immunity

Furthermore, Plaintiff argues Defendants are not entitled to qualified immunity. Id. at 48. Plaintiff argues Defendants caused a violation of his right to be free from unreasonable seizures protected by the Fourth Amendment because of having been subject to criminal process without probable cause. Id. Next, Plaintiff argues there is a stand-alone § 1983 claim upon a basis of malicious prosecution guaranteed by the Fourth Amendment, arising from a law enforcement officer's fabrication-of-evidence and that the claim was clearly established prior to 1985. Id. at 48–49. Plaintiff argues Defendants should have known long before their contact with Plaintiff they would be violating a constitutional right if they knowingly fabricated evidence to a public servant performing an official function to bring about a prosecution. Id. Moreover, prior to the undertaking of any criminal investigation, it was a criminal offense in Pennsylvania for any person,

21

including a law enforcement officer, to provide sworn or unsworn, misleading information to a public servant performing an official function.  Id.  Plaintiff argues it "strains to reason how any competent law enforcement officer could operate with an understanding providing false, inaccurate, misleading, or misinforming information to public servant(s) performing an official function or inserting the same into an Affidavit of Probable Cause which falsely accuses an innocent person of criminal behavior would be lawful."  Id.

Plaintiff also argues Defendants are not entitled to immunity under the Political Subdivision Tort Claims Act ("PSTCA").  Id. at 49–50.  Plaintiff contends the Third Circuit has held that the commission of the intentional tort of malicious prosecution is willful misconduct within the meaning of the PSTCA.  Id.  Plaintiff incorporates his arguments in his brief that Defendants' actions constituted actual malice or willful misconduct and that those actions were a proximate cause of Plaintiff's injury.  Id.

## B. Defendant Corvi's Contentions (ECF 54)

First, Corvi argues that he did not initiate proceedings against Plaintiff.  ECF 54-1 at 7–13. Corvi argues he did not prompt the investigation or intervene in the prosecutor's exercise of discretion and did not provide any information to the PSPCA or DAO that he did not believe was true.  Id.  Further, PSPCA never received a complaint from Corvi nor the PPD asking for an investigation into Plaintiff's handling of Saint.  Id. at 9.  Rather, PSPCA's investigation of Plaintiff was prompted by a complaint filed by Saint's owner with PSPCA, complaints filed by the public through ACCT's hotline, and a direct call to Wilson from ADA Paul.  Id.

Next, Defendant Corvi contends Plaintiff has failed to produce any evidence that he influenced the PSPCA's decision to recommend charges.  Id. at 10.  Corvi argues his involvement was limited to providing information to Wilson four months after the incident, after his supervisor

instructed him to attend. Id. at 10–11. By this time, Wilson and ADA Paul had already decided to recommend criminal charges and Wilson's purpose for requesting an interview with Corvi was to confirm that Saint was not injured during transport. Id. Defendant Corvi argues he could not have influenced the PSPCA's discretion post-interview as he did not receive or edit Wilson's interview notes/affidavit, and he did not see Wilson again until Plaintiff's preliminary hearing. Id.

Defendant Corvi also argues there is no evidence that shows he interfered with the DAO's discretion. Id. at 11–13. Defendant Corvi contends that following their investigation, Oakley and Wilson recommended criminal charges to the DAO, but Defendant Corvi did not speak to or meet with Schade regarding the Affidavit. Id. at 12. Defendant Corvi also did not effectuate the arrest of Plaintiff or conduct any investigations. Id. Defendant Corvi contends he simply recorded the dog's injury in an incident report and reported the incident to his sergeant who instructed Corvi that his role had concluded and that it was "up to [ACCT] to handle it." Id. at 12–13.

Defendant Corvi acknowledges that some of his testimony cannot be verified through the video footage. Id. at 15, 18. But he argues any weaknesses found in his testimony can be attributed to faulty memory, which does not constitute false testimony for purposes of malicious prosecution. Id. at 15–20. Corvi contends that he cannot be held liable for "knowingly providing false information," as he informed Wilson and Oakley, to the best of his ability, his perception of the events, and at no point did he believe he gave false testimony. Id. Furthermore, Wilson and ADA Beljean were not influenced by the unverifiable parts of his testimony. Id. at 20–21.

Moreover, Defendant Corvi argues there was probable cause to charge and arrest Plaintiff. Id. at 21–22. Corvi argues every person who reviewed the evidence arrived at the same determination: there was probable cause to arrest Plaintiff. Id. at 21–26. Corvi contends that each of their determinations was supported by undisputed material facts: Saint entered Officer Corvi's

23

vehicle unharmed, Saint arrived at ACCT unharmed, Plaintiff used the catch pole to retrieve Saint from the car, Saint exited Officer Corvi's vehicle with a severely broken and bloodied jaw. Id.

Defendant Corvi further contends that Plaintiff has not shown that he acted with malice. Id. at 26–27. Defendant Corvi argues he had no prior relationship with Plaintiff, he had no ill-will towards Plaintiff, and he did not seek to use the prosecution of Plaintiff for an extraneous purpose. Id. He contends his only role was providing a witness statement to the PSPCA through an interview with Wilson—an interview that he did not volunteer for or request. Id. Defendant Corvi argues Plaintiff offers only conclusory allegations that he "deliberately falsely imputed" animal cruelty behavior to Plaintiff. Id.

Lastly, Defendant Corvi argues that because Plaintiff has failed to show that he acted with malice, Plaintiff cannot recover under the PSTCA. Id. at 27–28. Specifically, because Plaintiff has failed to meet the lower threshold of malice under malicious prosecution, by extension, Plaintiff has failed to meet the higher threshold of actual malice required under the PSTCA. Id. Defendant Corvi also argues that Plaintiff cannot show that he engaged in willful misconduct. Id. At the time of his interview, Defendant Corvi did not believe that Plaintiff was undergoing a criminal investigation, as he believed that Wilson's investigation was administrative in nature. Id. At worst, Corvi argues it could be said he was indifferent, which is insufficient for liability. Id.

### C. Defendants PSPCA's and Wilson's Contentions (ECF 52)

First, Defendant Wilson argues that she did not initiate proceedings because as a Humane Society Police Officer, she does not have the power to charge individuals for violations of animal cruelty laws. ECF 52 at 4–6. Defendant Wilson contends this discretion is solely with the DAO and her responsibility is to provide the DAO with all the information and allow them to make the determination. Id. at 4. Here, Defendant Wilson contends she provided copies of all investigative

materials in her possession to the DAO, including witness statements, Defendant Corvi's interview, ACCT records, surveillance footage and images of Saint, and the Animal Cruelty Affidavit with her findings. Id. at 5. Defendant Wilson argues the decision to criminally charge Plaintiff was made solely by ADA Beljean, based on the totality of the information available at the time, including the Affidavit of Probable Cause which was sworn out by Detective Schade. Id.

Further, Defendant Wilson argues there is no evidence that she knowingly misrepresented any facts or omitted exculpatory information. Id. at 5. Defendant Wilson contends she did not change her testimony when drafting the Affidavit, even if her observations of Plaintiff's conduct from the surveillance footage differed from Defendant Corvi's observations. Id. She argues that she provided the DAO with all the investigative material, including Defendant Corvi's testimony and her own observations as an expert in catch pole usage, so that the DAO could make an informed decision about the charges. Id.

Moreover, Defendant Wilson argues Plaintiff cannot establish a lack of probable cause. Id. at 6–9. Defendant Wilson argues she conducted a reasonably thorough investigation: she reviewed surveillance footage, interviewed multiple ACCT staff members, and spoke with the only eyewitness, Defendant Corvi. Id. at 6–7. Defendant Wilson contends her probable cause determination was not dependent on any single factual detail, but rather on the totality of the circumstances. Id. at 7. Defendant Wilson argues that, based upon her specialized training in catch poles and professional experience, she determined that Plaintiff's decision to apply upward and downward leverage on the pole while the dog was biting down created a foreseeable and substantial risk of serious injury. Id. at 7–8.[19]

---

[19] Defendant Wilson further notes that Defendant Corvi's statement that Saint was lifted two feet off the ground was inaccurate, but she argues this statement does not defeat probable cause, as this fact did not impact her recommendation. ECF 52 at 7–8. Instead, her recommendation was based upon Plaintiff's application of leverage

Defendant Wilson next argues that she acted in good faith and without malice in her charging recommendation, further underscoring the reasonableness of her probable cause assessment.  Id. at 8.  She argues she did not doubt her recommendation for a misdemeanor charge when she swore out an Affidavit of her findings and submitted the information to Defendant Schade.  Id. at 9–10.  Defendant Wilson further contends she consistently maintained that the evidence supported a misdemeanor charge under § 5533, and when she learned that the DAO had independently upgraded the charges to a felony, she took the initiative to reach out and communicate that she believed a misdemeanor charge was more appropriate.  Id. at 9.  Defendant Wilson argues that just because the prosecutor elected to pursue a more serious charge does not negate the existence of probable cause for the underlying offense that she recommended.  Id. Defendant Wilson also contends that she did not mischaracterize the evidence nor omitted material exculpatory information in her affidavit, as her investigation was comprehensive, methodical, and entirely consistent with her professional training.  Id. at 10.  Further, Wilson argues Plaintiff has failed to show that she acted out of personal animus or improper motive, as there was never animosity between her and Plaintiff.  Id. at 9–10.

Defendant Wilson further argues that she is entitled to qualified immunity because probable cause defeats a Fourth Amendment malicious prosecution claim, and thus Plaintiff cannot establish a constitutional violation.  ECF 56 at 17.

---

while the dog was biting down, as she reasonably believed this constituted reckless ill-treatment.  Id. at 8.  Defendant Wilson argues her conclusion was supported by Dr. Gramanis, who indicated she had never encountered a dog sustaining a broken jaw merely from biting a metal object absent some underlying medical issue, and Dr. Borrok confirmed that Saint had no bony abnormalities or underlying conditions which would cause the bone to be compromised or unusually susceptible to fracture.  Id.

Lastly, Defendant Wilson contends that she is entitled to immunity under state law.  Id.
Under 18 Pa. Cons. Stat. § 5557, a humane society police officer acting in good faith and within
the scope of the authority provided under this subchapter shall not be liable for civil damages
because of an act or omission during an investigation or enforcement action.  Id.  Although the
statute does not apply to "an act or omission intentionally designed to harm or to an act or omission
that constitutes gross negligence or willful, wanton or reckless conduct," Defendant Wilson argues
there is no evidence that she acted with gross negligence, recklessness, or any intent to harm, and
her conduct falls squarely within § 5557.  Id.

As to the PSPCA, it contends that it can only be liable under *respondeat superior*, but here,
Plaintiff cannot demonstrate that Defendant Wilson acted without probable cause and with malice
when recommending charges against Plaintiff.  ECF 52 at 12–13.  Because Plaintiff cannot show
that Defendant Wilson maliciously prosecuted Plaintiff, his common law malicious prosecution
claim against Defendant Wilson's employer fails.  Id. at 13.

PSPCA further argues §§ 213 and 317 of the Restatement (Second) of Agency do not
salvage Plaintiff's claim because they depend upon underlying tortious conduct by the employee.
Id. at 13–14.  Under § 213, a principal may be liable for harm caused by its agent if the principal
was negligent in the employment, supervision, or failure to prevent the agent's tortious conduct.
Id. at 13.  The PSPCA argues that § 213 is inapplicable because Plaintiff cannot establish that
Defendant Wilson committed malicious prosecution, there is no predicate wrongdoing upon which
to base liability.  Id.  Similarly, § 317 imposes a limited duty on an employer to control the conduct
of an employee only when the employee is acting outside the scope of employment and applies
only when the employer's failure to control the employee results in "bodily harm."  Id.  The
PSPCA contends that § 317 is inapplicable because it applies only when the employee is acting

27

outside the scope of employment, but Plaintiff's theory is that Defendant Wilson acted within the scope of her employment in initiating criminal proceedings against Plaintiff. Id. at 13–14.

### D.  Defendant Schade's Contentions (ECF 53)

Defendant Schade first argues that any alleged false statements and omissions were not material to the finding of probable cause, and even accounting for these alleged inaccuracies and omissions, probable cause existed. ECF 53 at 7–11. When Schade prepared the Affidavit, probable cause existed that Plaintiff had recklessly ill-treated the dog, as Plaintiff does not contest that Saint was not injured prior to arriving at ACCT on August 4, 2021.[20] See id. at 8–10 (undisputed facts). As ADA Beljean explained, the following facts supported probable cause: "[Saint] was not injured in any way on the drive ... the only person who interacted with [Saint] ... was [Plaintiff], [and Plaintiff] was the person who used the catch pole, struggled with the catch pole ... to get the catch pole around Saint's neck, and in [Plaintiff's] use of the catch pole, Saint's jaw was broken on both sides." Id. at 9 n.1.[21]

Next, Defendant Schade argues that he did not knowingly or deliberately make false statements or omissions in the Affidavit, and his role in initiating animal cruelty prosecutions, including Plaintiff's, was a ministerial one. Id. at 5–7. Defendant Schade prepared the Affidavit because of the constraints of the PARS system in Philadelphia County, such that Wilson was unable to generate an affidavit of probable cause and present it to the issuing authority. Id. at 7. Defendant Schade contends he did not review the investigative information provided to him or undertake his own independent investigation. Id. at 5–6. Here, he was provided with credible

---

[20] Defendant Schade concedes that he initiated proceedings. See ECF 53 at 5.

[21] Although Plaintiff disputes that he improperly handled the catch pole, Defendant Schade argues this is not a genuine issue of material fact for purposes of liability. See ECF 53 at 10.

eyewitness reports of Plaintiff's conduct from Defendant Wilson (which was reviewed and approved by Oakley). Id. at 5–6, 10. Therefore, he had knowledge of sufficient facts to establish probable cause to charge Plaintiff, and it was not necessary for him to interview other witnesses. Id. at 5–6, 11. Defendant Schade argues had no obvious reasons to doubt the assertions because he relied upon Wilson's investigation and her twenty years of experience investigating thousands of animal cruelty cases in Pennsylvania. Id. at 5–6. Moreover, ADA Delbridge determined that the facts supported probable cause to bring misdemeanor and felony charges against Plaintiff. Id. Defendant Schade contends he prepared the Affidavit the same way he prepared other affidavits, relying upon the investigative findings and discovery from PSPCA officers. Id.

Lastly, Defendant Schade argues that he is entitled to qualified immunity because Plaintiff does not allege the violation of a constitutional right. Id. at 11–12. Defendant Schade argues Plaintiff's Fourth Amendment malicious prosecution claim is deficient because probable cause existed, there was no evidence of malicious intent, and there was no evidence that he acted recklessly in relying upon Defendant Wilson's report. Id. at 12. Defendant Schade also argues he is entitled to immunity as to Plaintiff's state law malicious prosecution claim under the PSTCA. Id. at 12–14. Schade contends the evidence does not support Plaintiff's contention that he acted with malice or willful misconduct. Id.

**VII.    DISCUSSION– PLAINTIFF'S MOTION (ECF 50)**

At oral argument on May 20, 2026, (see ECF 75–76), Plaintiff's counsel outlined the undisputed material facts supporting summary judgment in his favor as follows:

1. Plaintiff was charged with animal cruelty.

2. Plaintiff did not abuse Saint, and this was clear from the video. Plaintiff's behavior was proper, and he did not torture the dog.

29

3. Plaintiff did not use the catch pole with intent to harm the dog, as his behavior was not deliberate. Therefore, this could not give rise to criminal behavior.

4. No fair reasonable person could look at the video and say Plaintiff's behavior rises to a level of crime. The video does not show that Plaintiff lifted Saint two feet off the ground and dragged Saint into the building.

5. The facts included in the Affidavit of Probable Cause were embellished and fabricated. Corvi's statement was inconsistent with the surveillance video, and Wilson deliberately did not include this information in her Affidavit.

However, Defendants Corvi, Wilson, PSPCA, and Schade all disagreed with Plaintiff's "undisputed" facts. ECF 75–76; see also ECF 53, ¶¶ 26–27, 33–40; ECF 55-1, ¶¶ 6–12, 14, 89–93, 99; ECF 57, ¶¶ 6–12, 14–15, 27–29, 33. For instance, Defendant Corvi agreed with the fact that Saint was delivered by Officer Corvi to ACCT uninjured on August 4, 2021 (which Plaintiff's counsel agreed with). ECF 54-4, ¶ 6; ECF 55-1, ¶ 70; ECF 75–76. But Defendant Corvi disputed the rest of Plaintiff's facts, stating that Plaintiff did abuse the dog, as it was captured on video and reviewed by experienced PSPCA investigators who deemed that Plaintiff used an improper technique for the catch pole. ECF 54-4, ¶ 27; ECF 75–76.

Similarly, Defendants Wilson and PSPCA stated they did not agree with Plaintiff's undisputed facts. ECF 75–76; see also ECF 57, ¶¶ 6–12, 14–15, 27–29, 33. Defendants Wilson and PSPCA argued there were other undisputed facts, including that Plaintiff worked at ACCT, Saint was delivered to ACCT, Saint was uninjured before being brought to ACCT, and then once Saint was in Plaintiff's custody, Saint was injured and had to be euthanized. ECF 75–76; see also ECF 52, ¶¶ 5–6, 32, 35–40, 42. Plaintiff's counsel agreed to these facts. See ECF 75–76. Defendants Wilson and PSPCA further asserted that Wilson conducted the investigation, to which

Plaintiff stated that it was not a fair investigation, as it was embellished. ECF 75–76; see also ECF 52, ¶¶ 60, 62–63, 68–129, 136–147; ECF 64, ¶¶ 140, 142, 146, 213. But Defendants Wilson and PSPCA argued that whether the investigation was fair or embellished was not material for summary judgment purposes. ECF 75–76. Moreover, Defendants Wilson and PSPCA asserted that Wilson gathered all the evidence, including ACCT surveillance videos and documents, Wilson's interview with Corvi, and Wilson's interviews with other ACCT employees. ECF 75–76. Although Wilson took a position, she turned over all the supporting documents to the DAO, and the DAO made an independent determination on probable cause. ECF 75–76.

Defendant Schade also disputed Plaintiff's facts, asserting that he is immune because he acted in good faith, taking Defendant Wilson's conclusions and giving everything to the DAO for criminal charges. ECF 75–76; see also ECF 53, ¶¶ 43–49.

This Court finds that there are many disputed facts in the record, but these facts are not material. Moreover, as discussed below, settled principles of law protect Defendants from liability and thus preclude summary judgment in Plaintiff's favor. See Anderson, 477 U.S. at 248; Fed. R. Civ. P. 56(c)(1). Accordingly, the Court will **DENY** Plaintiff's Motion.

## VIII.   DISCUSSION – DEFENDANT CORVI'S MOTION (ECF 54)

Defendant Corvi argues he is entitled to summary judgment because he did not initiate proceedings, there was probable cause to charge Plaintiff, and he did not act with malice. See ECF 54-1.

The Court finds that Defendant Corvi did not initiate proceedings, as he only provided an interview to Wilson a few months later to confirm that Saint was not injured during transport. He did not file a complaint with law enforcement, did not provide information to law enforcement with the intent that criminal proceedings be instituted, and did not provide false testimony or false

evidence. Henderson, 853 F. Supp. 2d at 518–19. He also did not interact with Detective Schade, who swore to the Affidavit of Probable Cause. Id.; ECF 54-4, ¶ 50; ECF 52-5, at 18:2-19.

Next, there was probable cause to charge Plaintiff, based on Wilson's thorough investigation. Ockley, 802 F. Supp. 3d at 760. The inquiry is the totality of the circumstances available to the officer *at the time of the arrest*, and the facts and circumstances within the officer's knowledge and of which they had reasonably trustworthy information. Id. Plaintiff points to a litany of false facts and omissions and asks the Court to insert into the Affidavit of Probable Cause expert opinions that were obtained years later and were not available at the time of the investigation.[22] ECF 50-2, at 39–43. However, after viewing the surveillance videos and conducting interviews, a reasonable person could have found that Plaintiff recklessly ill-treated Saint. Goodwin, 836 F.3d at 327; ECF 50, Exhibit 17; ECF 50, Exhibit 18; ECF 50, Exhibit 19; ECF 52-9; ECF 52-10; ECF 52-11; ECF 52-14; ECF 52-15; ECF 52-16; ECF 52-17.

Furthermore, the only "false" fact that is remotely applicable to liability is Plaintiff lifting the dog two feet in the air. See ECF 52-5, at 41:15-19. But this fact is not material. ADA Beljean and Defendant Wilson both testified that this fact did not influence their decision on probable cause and Wilson indicated that her report stated her own views of the video and how it was different from what Officer Corvi perceived. ECF 52, ¶¶ 122–23, 141; ECF 64, ¶¶ 122–23, 141; ECF 52-8 at 291:19-24, 292:4-8; ECF 52-25, at 58:21–59:23. Defendant Wilson also believed, based on her viewing of the surveillance video, that Plaintiff acted recklessly. ECF 52-8, at 207:11-24, 226:4–229:11. Plaintiff argues that the investigation was not fair, see ECF 75–76, but this Court finds

---

[22] Moreover, in support of his Motion, Plaintiff attaches "internal memorandum" from ACCT, purportedly related to an internal investigation regarding the August 4, 2021, Incident. See ECF 50, Exhibit 23; ECF 50, Exhibit 24. However, these internal memoranda are unsigned, undated, and there is no indication that any Defendant was aware of their existence prior to the swearing of the Affidavit of Probable Cause.

that Wilson's investigation was reasonable, and she had a good faith belief that Plaintiff committed a crime.  Ockley, 802 F. Supp. 3d at 760.

This Court also finds that Defendant Corvi did not act with malice.  Corvi testified that he genuinely took issue with how Plaintiff handled Saint and reported it to his sergeant, who told him it was up to ACCT to handle it.  ECF 52-5, at 45:21–47:13.  He also testified that he attempted to go inside ACCT to speak with someone, but he was stopped at the door.  Id.  Further, Corvi did not know Plaintiff prior to this incident, so there was no ill will or extraneous improper purpose.

Alternatively, Defendant Corvi is entitled to qualified immunity.  The Third Circuit has held that officials are entitled to qualified immunity unless their conduct violated a clearly established constitutional right.  Goodwin, 836 F.3d at 326–27.  Thus, courts engage in a two-pronged inquiry: (1) whether the plaintiff has shown the violation of a constitutional right, and (2) whether the right was "clearly established" at the time of the official's conduct.[23]  Id.  Here, Plaintiff claims he was arrested, detained, and officials initiated criminal proceedings against him without probable cause, in violation of the Fourth Amendment and state law.  ECF 50-2 at 48.  However, a finding of probable cause is a complete defense to these claims.  Goodwin, 836 F.3d at 326–27; Corrigan v. Cent. Tax Bureau of Pa., Inc., 828 A.2d 502, 505 (Pa. Commw. Ct. 2003).  Here, there was probable cause to charge Plaintiff, and Corvi is entitled to qualified immunity.

Therefore, the Court will **GRANT** Defendant Corvi's Motion as to Counts I and V.

---

[23] Plaintiff cites Halsey v. Pfeiffer, 750 F.3d 273, 294 (3d Cir. 2014), for the proposition that there is a stand-alone § 1983 malicious prosecution claim under the Fourth Amendment, arising from an officer's fabrication of evidence and that the claim was clearly established prior to 1985.  But Halsey held that a defendant who was "convicted at a trial at which the prosecution has used fabricated evidence," has a stand-alone claim under § 1983 based on the *Fourteenth Amendment* if "there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted." Id. (emphasis added).  Here, Plaintiff brings malicious prosecution claims under the *Fourth Amendment* and state law, not fabrication of evidence claims.  And Plaintiff was never convicted, since the charges were *nolle prossed*.  It seems that Plaintiff conflates these types of claims.  In any event, Defendants did not knowingly fabricate evidence.

**IX.    DISCUSSION – DEFENDANTS PSPCA'S AND WILSON'S MOTION (ECF 52)**

Defendant Wilson argues that she is entitled to summary judgment because she did not initiate proceedings, there was probable cause to charge Plaintiff, and she did not act with malice. See ECF 52.  Defendant PSPCA argues that it is entitled to summary judgment because it cannot be liable under *respondeat superior* if Defendant Wilson is not liable.  See id.

First, the Court finds that Defendant Wilson initiated proceedings, as she conducted the investigation, provided the information to the DAO with the intent that Plaintiff would be charged with a misdemeanor violation of cruelty to animals, and recommended criminal charges be filed against Plaintiff.  Henderson, 853 F. Supp. 2d at 518–19; ECF 52, ¶¶ 127–28; ECF 52-8, at 17:10-15, 21:5–22:11, 75:12–76:19, 91:17–93:6, 136:23–137:13, 170:16-22.

However, as discussed above, the Court finds there was probable cause to charge Plaintiff, based on Wilson's thorough investigation, interviews, and information available to her at the time. See Ockley, 802 F. Supp. 3d at 760; Part VIII.  Moreover, Wilson did not act with malice. Although Wilson may have been influenced by ADA Paul and the PSPCA's hotline complaints, see ECF 54-4, ¶ 22; ECF 60-3, ¶ 22, she undertook a reasonable and thorough investigation. Wilson testified that she genuinely believed Plaintiff's actions were reckless because he improperly used the catch pole by moving it while Saint was biting on it, creating leverage that broke Saint's jaw.  ECF 52-8, at 198:2-8, 218:1–221:23; ECF 52, ¶ 128.  Plaintiff also testified that there was no prior animosity with Wilson.  ECF 52-6, at 43:11-17.  Thus, there is no evidence of ill will or an extraneous improper purpose.

Alternatively, the Court finds that Wilson is entitled to qualified immunity.  First, there was probable cause to charge Plaintiff, which is a complete defense to Plaintiff's claims.  Goodwin, 836 F.3d at 326–27; Corrigan, 828 A.2d at 505.  Second, Wilson is entitled to immunity under 18

Pa. Cons. Stat. § 5557.  ECF 56 at 17.  Under § 5557, a humane society police officer acting in good faith and within the scope of the authority provided shall not be liable for civil damages because of an act or omission during an investigation.  Id.  Although § 5557 does not apply to "an act or omission intentionally designed to harm or to an act or omission that constitutes gross negligence or willful, wanton or reckless conduct," there is no evidence that Wilson acted with gross negligence, recklessness, or intent to harm.  Id.  Wilson conducted a thorough investigation and made a reasonable decision based upon the information available to her at the time.

As to the PSPCA, the Court finds that it is not liable under *respondeat superior*.  Although the Third Circuit has held that § 1983 liability cannot be predicated on *respondeat superior*, see Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 290–91 (3d Cir. 2018), Pennsylvania provides that a principal may be held liable for the act of his agent in instituting a malicious prosecution when the act of the agent was authorized or when authority may be inferred from the nature and scope of the employment, see Markley v. Snow, 56 A. 999, 1000 (Pa. 1904).  Here, Plaintiff brings a malicious prosecution claim against the PSPCA under Pennsylvania state law.  Wilson does not dispute that her conduct in recommending charges was within the scope of her employment.  ECF 52 at 12.  However, Plaintiff does not discuss this issue in his Motion and therefore fails to make the required showing under Rule 56 to impose liability on the PSPCA.  Moreover, because Plaintiff's claims against Wilson fail, the PSPCA cannot be liable based on *respondeat superior*.

Accordingly, the Court will **GRANT** Defendants PSPCA's and Wilson's Motion as to Counts II, III and VI.

X.    **DISCUSSION – DEFENDANT SCHADE'S MOTION (ECF 53)**

Defendant Schade contends that he is entitled to summary judgment because there was probable cause to charge Plaintiff, and he did not act with malice.  See ECF 53.

As discussed above, there was probable cause to charge Plaintiff, based on Wilson's thorough investigation, interviews, and information available at the time. See Ockley, 802 F. Supp. 3d at 760; Part VIII. Although Schade did not conduct his own investigation, he testified that he acted in accordance with proper procedures when he took Wilson's report and copied it into the Affidavit of Probable Cause. ECF 52-20, Exhibit S (Schade's Deposition), at 41:11-15, 49:5–50:13; see also ECF 52, ¶¶ 147–155.

Second, the Court finds that Defendant Schade did not act with malice. Schade testified and the evidence supports that he acted in a ministerial role in preparing the Affidavit of Probable Cause, based upon the restrictions of the PARS system in Philadelphia County. ECF 52-20, at 41:11-15, 49:5–50:13; ECF 53 at 5–7; ECF 53, ¶¶ 43–50. Therefore, there is no evidence of ill will or an extraneous improper purpose.

Alternatively, this Court finds that Defendant Schade is entitled to qualified immunity. As discussed above, there was probable cause to charge Plaintiff, and therefore, Defendant Schade is entitled to qualified immunity. Goodwin, 836 F.3d at 326–27; Corrigan, 828 A.2d at 505.

Accordingly, the Court will **GRANT** Defendant Schade's Motion as to Counts IV and VII.

## XI.    CONCLUSION

An appropriate order follows.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 25\25-1318 Walton v Corvi\25-1318 - Memo re MSJ.docx